**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SALAM MAKLAD,<br><br>　　　　　Petitioner,<br><br>v.<br><br>RON MURRAY, Warden, Mesa Verde ICE processing center, et al.,<br><br>　　　　　Respondents. | Case No. 1:25-cv-00946 JLT SAB<br><br>ORDER GRANTING PRELIMINARY INJUNCTION[1] (Doc. 2) |

Salam Maklad, a Syrian national, entered the United States in 2002 without valid entry documents or a visa. (Doc. 2-1 at 2) She was arrested by immigration officials. After remaining detained for nine days, the immigration official determined she was not a flight risk or a danger to the community and released her on her own recognizance. *Id*. In doing so, the government determined that she did not pose a risk of flight or a danger to the community. *Id.* at 2-3. She has reported to the ICE Field Office as directed and done everything else required of her. *Id*. During this interval, Ms. Maklad has applied for asylum based upon her claim that she is a member of a religious community, Druze, which is a persecuted group in Syria. (Doc. 2-2 at 2)

---

[1] Upon the agreement of the parties, the Court converts the motion for temporary restraining order into one for preliminary injunction. Respondents had notice, opportunity to respond and be heard. Additional briefing is not required and the standard for a TRO and a preliminary injunction is the same. As such, given the nature of the relief granted by this order and to allow Respondents to appeal should they choose, the Court converts this to a Motion for Preliminary Injunction.

1   On July 9, 2025, she reported for what she thought would be a "check-in" meeting. (Doc. 2-1 at 5) No such meeting occurred. *Id*. Instead, she was told that because the United States Citizenship and Immigrations Services office had not yet decided her asylum claim, she was required to be taken into ICE custody. *Id.* at 2. She was arrested and taken into custody where she has remained. *Id.* She claims that the officers did not present her an arrest warrant or assert any basis for the arrest except that she had a pending asylum application. *Id*.

Since her arrival in the country three years ago, Ms. Maklad has married. (Doc. 1 at 4) A few months after they married, Ms. Maklad's husband was granted asylum. (Doc. 2-2 at 2, 4) Her petition asserts that this entitles her to immediate eligibility for legal immigration. *Id*. ICE agrees that she has no criminal history. (Doc. 9-1 at 10) However, ICE placed her in "expedited removal proceedings," and three weeks later, summarily dismissed her asylum petition due to her detention. *Id*. Ms. Maklad alleges that because she has been in the United States for three years, the expedited removal process cannot be applied to her. (Doc. 2-1 at 11)

On August 2, 2025, Ms. Maklad filed a petition for writ of habeas corpus alleging that her detention constitutes a violation of the Fifth Amendment's right to substantive and procedural due process, her Fourth Amendment right prohibiting her unlawful seizure and her First and Fifth Amendment rights to petition for redress. (Doc. 1 at 16-19) She seeks immediate release from custody, a declaration of the violation of her rights under the First, Fourth and Fifth Amendments, an injunction prohibiting her transfer away from this District and from her further unlawful detention, and for fees and for her attorney's fees. *Id*. at 20)

On the same day, she also filed an ex parte motion for a temporary restraining order. (Doc 2.) In this motion, she seeks her immediate release and an injunction against her further arrest unless she is provided a pre-deprivation bond hearing in this Court or in the immigration court, that her detention is necessary because she poses a flight risk or a danger to the community, or an order prohibiting her transfer out of this District until these habeas proceedings are concluded. *Id*. at 17.

For the reasons set forth below, the Court converts the request for a temporary restraining order into a request for a preliminary injunction and **GRANTS** the motion.

2

## I. FACTUAL BACKGROUND

Ms. Maklad came to the United States from Syria on September 11, 2022 without valid entry documents or a visa. (Doc. 9-1 at 6) She was arrested and detained. *Id*. Upon her detention, she reported to immigration officials that she left Syria due to her fear of persecution or torture if she remained there. (Doc. 2-2 at 2; Doc. 9-1 at 6) Ms. Maklad reports that she is a member of a minority religious group, the Druze, which is "currently under violent attack, including by government forces," which is why she fled Syria. (Doc. 2-2 at 2) Despite this, it does not appear that she was referred for a credible fear interview at that time.

The same date, the Border Patrol determined that Ms. Maklad was inadmissible to the United States because she was a citizen of Syria and not of the United States and because she had no valid visa or other entry document required by law. (Doc. 9-1 at 14) Border Patrol agents placed her in "expedited removal." *Id.* Even still on September 20, 2022, ICE released her on parole. (Doc. 9-1 at 18) The parole document reads,

> Your parole authorization is valid for one year beginning from the date on this notice and will automatically terminate upon your departure or removal from the United States or at the end of the one-year period unless ICE provides you with an extension at its discretion. ICE may also terminate parole on notice prior to the automatic termination date. Parole is entirely within the discretion of ICE and can be terminated at any time and for any reason. Your parole is not valid for work authorization and is not an admission in lawful status.
>
> Parole is conditioned on you complying with the terms and conditions of your release. You must notify ICE and the immigration judge of any address correction or address change. You must report for every scheduled hearing before the immigration court and every appointment as directed by ICE (including for removal from the United States should you become subject to a final removal order). You must not violate any local, State or Federal laws or ordinances. You must comply with any other specified conditions if identified separately.

*Id*. Ms. Maklad signed the document acknowledging receiving it. *Id*.

Over the nearly three years since, ICE has, apparently, continued Ms. Maklad on parole. After being granted employment authorization, she obtained a job at a restaurant. (Doc. 2-2 at 2) In February 2025, she married. *Id*. Throughout this nearly three-year period of parole, Ms. Maklad "has followed all government instructions and complied with every requirement placed on her. She regularly appeared for ICE check-ins and has never missed an appointment. More recently, she was required to download the SmartLink application on her phone, and used that

1 application to check-in with ICE every Tuesday using GPS technology and facial recognition.
2 She updated immigration authorities with her current address, as requested." (Doc. 2-2 at 2.)
3 Also, on September 1, 2023, ICE received Ms. Maklad's application (the I-589 petition) for
4 "asylum, withholding of removal and protection under the Convention Against Torture." *Id*.; Doc.
5 9-1 at 12.

On April 27, 2025[2], at a regularly scheduled meeting at the ICE Field Office in San
Francisco, Ms. Maklad was told that she would need to complete a "credible fear" interview and
that she should report on July 9 to "check on her case." (Doc. 2-1 at 5) When she arrived for the
"check-in" meeting, an ICE officer took her into custody "because an officer had not yet decided
her application." *Id*. Ms. Maklad contends that the officer did not present her with an arrest
warrant or any other explanation for her arrest. *Id*. The government's evidence indicates that
when Ms. Maklad was taken into custody in July, she was presented with an I-200 form (Doc. 9-1
at 12), which, in general, is an administrative warrant for arrest issued by the Department of
Homeland Security, which must be founded upon probable cause that the immigrant is removable
under U.S. immigration law. 8 C.F.R. § 236.1. The government has not produced a copy of the I-200 form, though, at the hearing, the government conceded that there were no changes in
circumstances since the original determination that Ms. Maklad does not pose a flight risk or a
danger to the community. Ms. Maklad again reported to immigration officials that she had a fear
of persecution or torture if returned to Syria. After her arrest, Ms. Maklad was allowed to call her
husband, who rushed to the ICE office. *Id*. When he objected to his wife's detention, the ICE
officer again said that Ms. Maklad's detention was because her asylum petition had not yet been
decided. *Id*.

Ms. Maklad has remained detained since July 9, 2025. She claims that her detention poses
significant health risks to her. (Doc. 2-2 at 3.) She suffers from various medical conditions

---

[2] On April 14, 2025, the "APSO accepted the triggering documents." (Doc. 9-1 at 12) The Court understands that "APSO" refers to the Asylum Pre-Screening Officer. *Seydou v. Immigr. & Customs Enf't*, 2018 WL 11448766, at *1 (S.D. Fla. May 2, 2018), report and recommendation adopted, No. 17-CV-21383, 2018 WL 11448765 (S.D. Fla. May 31, 2018). The government declarant fails to explain this entry. However, it seems to suggest that it was not until April 14, 2025—about 19 months after Ms. Maklad submitted to asylum petition, that ICE acknowledged receiving it.

1   including, "hypothyroidism, polycystic ovary syndrome, prediabetes, and vitamin D deficiency."
2   *Id*. She told the ICE agents when she was arrested that she takes medication, Levothyroxine, for
3   "Hormone issues" and that she did not have her medication with her. (Doc. 9-1 at 12) Ms. Maklad
4   reports that she has been unable to eat or sleep while in custody, that she has constant anxiety,
5   and that, due to witnessing physical fights between other detainees, she is in constant fear for her
6   physical safety. (Doc. 2-2 at 4) She is required to wake every day at 5 a.m. to report outdoors. *Id*.
7   Ms. Maklad's husband has made the 10-hour round trip each Saturday to visit her and has
8   observed Ms. Maklad's decline. *Id*.

9   On July 31, 2025, Ms. Maklad's husband received a letter sent to her at their home,
10  notifying her that ICE "had dismissed her I-589 petition," which has caused her distress because
11  this means she will not be able to present her asylum claims. (Doc. 2-2 at 4) Notably, because Ms.
12  Maklad's husband asylum request was granted on June 24, 2025—four months after the couple
13  married—Ms. Maklad asserts that she is eligible for derivative asylum. (Doc. 2-2 at 4) Ms.
14  Maklad's husband has submitted the I-730 Refugee/Asylee Relative Petition, with the supporting
15  documentation, on Ms. Maklad's behalf. *Id*. at 5.

16  On August 2, 2025, Ms. Maklad filed a petition for writ of habeas corpus in which she
17  claims a violation of her substantive and procedural due process rights under the Fifth
18  Amendment, because her detention is punitive because it does not further "government's
19  legitimate goals of ensuring the noncitizen's appearance during removal proceedings and
20  preventing danger to the community." (Doc. 1 at 16-18) She contends that she is neither a flight
21  risk nor does she pose a danger to the community. *Id*. Likewise, she asserts that she was entitled
22  to a pre-deprivation hearing before her parole status was revoked. *Id*. at 17-18. She asserts that
23  her arrest was unlawful because there was no change in her circumstances such that there was no
24  justification for her arrest. *Id*. at 18-19. Finally, Ms. Maklad asserts that her arrest and detention
25  has meaningfully interfered with her right to petition for redress. *Id*. at 19-20.

26  At the same time, Ms. Maklad filed a motion for temporary restraining order. (Doc. 2-1)
27  In this motion, she seeks immediate release from custody and an order enjoining the government
28  from re-detaining her "absent further order of this Court" or unless the government demonstrates

at a pre-deprivation hearing that she is a flight risk or a danger to the community, and to prohibit her removal from this District until her habeas proceedings conclude. *Id*. at 17.

Two days after filing her petition and motion for temporary restraining order, Ms. Maklad was awakened early and told that she would have her credible fear interview that morning. (Doc. 11 at 3, n. 1) She requested to have the assistance of counsel for the interview, but the interview went forward without counsel after a "halfhearted" attempt to reach counsel failed. *Id*. Ms. Maklad believes that the government is now "racing to obtain a final removal order before [she] can vindicate her rights in court." *Id*. Even still, at the hearing on this preliminary injunction, Ms. Maklad's counsel reported that the credible fear interview was resolved in her favor, and counsel anticipates that the case will be transferred into a § 240 proceeding.

## II.    LEGAL BACKGROUND

### A.    Expedited removal

An immigrant may be placed in expedited removal status for various reasons, including that the person entered the United States without a valid visa or other valid entry documents. Rather than entitling the immigrant to counsel and other procedural protections, in expedited removal, the process is overseen by an immigration officer, rather than an immigration judge. 8 C.F.R. § 235.3(b)(2)(i). The officer asks the immigrant questions about their "identity, alienage, and inadmissibility," and whether they intend to apply for asylum, fear persecution or torture, or fear returning to their country of origin. § 235.3(b)(2)(i), (b)(4). Noncitizens are not entitled to counsel during this questioning, and no recording or transcript is made. 8 C.F.R. § 235.3(b)(2)(i).

If the immigrant claims asylum of fear of persecution or torture, or a fear of returning to his or her country, "the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with 8 CFR 208.30." § 253(b)(4). Once the referral happens, the referring officer must provide the immigrant with a written disclosure (Form M-444), which describes the credible fear interview, including,

> (A) The purpose of the referral and description of the credible fear interview process;
> (B) The right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government;
> (C) The right to request a review by an immigration judge of the asylum

        officer'' credible fear determination; and
          (D) The consequences of failure to establish a credible fear of persecution or torture.

§ 253(b)(4)(i). The asylum officer then must interview the immigrant and determine if the immigrant expressed a credible fear of persecution or torture. Whatever the officer's determination, it must be reviewed by the supervisory asylum officer before it becomes effective. § 208.30(3)(8). If there is a finding of credible fear, the case is converted to a § 240 proceeding[3] and set before an immigration judge. The § 240 adversarial proceeding entitles the immigrant to various rights including the right to counsel, the right to present evidence and the right to cross-examine witnesses. 8 U.S.C. § 1229a(b)(4). The proceedings are recorded, and the immigrant has the right to challenge the IJ's determination on appeal to the Board of Immigration Appeals and, if appropriate, to the Circuit Court of Appeals. *Id*. If the asylum officer and the supervisor determine that the immigrant has not demonstrated a credible fear of persecution or torture, the immigrant may request review by an IJ. § 208.30(g). For all intents and purposes, the IJ's determination is final without further review. *Id*. Indeed, habeas corpus review of the determinations made related to the expedited removal is limited. 8 U.S.C. § 1252(e)(2).

      Last week, in *Coalition for Humane Immigrant Rights v. Noem*, No. 1:25-cv-00872-JMC, 2025 WL 2192986 (D.D.C. Aug. 1, 2025), the District Court in the District of Columbia determined that under 8 U.S.C. § 1225(b)(1)(A)(iii)(II), a person who has been paroled cannot be designated for expedited removal. This section allows an immigration officer to place an inadmissible person in expedited removal as long as the person "has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." *Coalition* concluded that the statute "forbids the expedited removal of noncitizens who have been, at any point in time, paroled into the United States." *Id*. at *22. The Court need not, at this juncture, determine whether Ms. Maklad continued to be in expedited removal through her arrest and until now—though the authorities strongly suggest otherwise—or whether she has

---

[3] Alternatively, the case may be moved into administrative asylum proceedings under § 208.30(e)(8).

been placed into expedited removal after her arrest—which, the authorities strongly suggest cannot occur.

### B.     Parole Revocation

In *Y-Z-H-L v Bostock*, 2025 WL 1898025, at *10-12 (D. Or. July 9, 2025)—issued on the very day that Ms. Maklad was arrested—the court explained the parole process in immigration cases and noted that before parole may be revoked, the parolee must be given written notice of the impending revocation, which must include a cogent description of the reasons therefore. The court held,

> Section 1182, however, has a subsection titled "Temporary admission of nonimmigrants," which allows noncitizens, even those in required detention, to be "paroled" into the United States. This provision, at issue in this case, states:
>
> > The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and **when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.**
>
> 8 U.S.C. § 1182(d)(5)(A)

(Emphasis added.) *Y-Z-H-L* determined that under the Administrative Procedure Act, immigration parolees are entitled to determinations related to their parole revocations that are not arbitrary, capricious or an abuse of discretion. *Id*. at *10. An agency acts arbitrarily and capriciously by failing to make a reasoned determination or where the agency fails to "articulate[] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*. Parole revocations in the context of the INA, must occur on a case-by-case basis and may occur "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." *Id*. at *12, quoting § 212.5(e). Section 212.5(e) requires written notice of the termination of parole except where the immigrant has departed or when the specified period

of parole has expired.

In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025), the Court held similarly. In *Pinchi,* the court held,

> . . . even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody. See *Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

*Id.* Other courts, including this Court, have held similarly. *Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").

## II.     ANALYSIS

### A.     Jurisdiction

#### 1.     Habeas Corpus

Under 28 U.S.C. § 2241, the Court the authority to determine a petition for writ of habeas corpus in which the petitioner asserts he is being held in custody "in violation of the Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

Ms. Maklad seeks her immediate release from custody, which she contends violates the Constitution of the United States. (*See* Doc. 2-1) Thus, she properly invokes the Court's habeas jurisdiction.

**2.     Judicial Review under the INA**

The INA limits judicial review in many instances. The government argues that the Court lacks the authority to evaluate the questions presented in this TRO. (Doc. 9 at 5) The government asserts that § 1252(g), "strips this Court of jurisdiction over the executive's decision to execute an order of removal . . ." that arises from the execution of removal orders. The Court disagrees.

First, there is no removal order at issue here, instead, the question presented is whether the Court has the authority to review the termination of Ms. Maklad's parole. Second, the argument that the termination of Ms. Maklad's parole "arises" from a removal order fails in light of *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018), in which the Court held that § 1252(g) precludes judicial review only as to the three areas specifically outlined in the subsection. *See also Reno v. American–Arab Anti–Discrimination Committee*, 525 U.S. 471, 482 (1999). Finally, as noted by Ms. Maklad, numerous courts have found that jurisdiction exists in this context and have evaluated conduct like that alleged here. (Doc. 11 at 8)

**A.     Preliminary Injunction**

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1) they are "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). The Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*, at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support the issuance of a preliminary injunction where there are "serious questions on the merits … so

long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). Preliminary injunctions are intended to "merely to preserve the relative positions of the parties until a trial on the merits can be held, and to balance the equities at the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. ___, 145 S. Ct. 659, 667 (2025) (citations omitted).

The Court agrees that the status quo refers to "the last uncontested status which preceded the pending controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963) (quoting *Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir. 1958)). In the Court view, that is the status before Ms. Maklad was arrested and was still on parole. *See Kuzmenko v. Phillips,* No. 25-CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10, 2025) (granting a temporary restraining order requiring immediate release of the petitioner back to home confinement from custody, as a restoration of the status quo).

Even if the Court's action here constitutes a mandatory injunction,[4] the evidence supports that action. Ms. Maklad alleges she has suffered and is suffering violations of her substantive and procedural due process rights and that her continued unlawful detention will impose on her serious injury if the injunction does not issue. The injunction issued here is on firm legal footing result does not appear to be doubtful either; due process clearly requires that Petitioner be given a hearing before his bond is revoked. These injuries are not capable of redress through monetary compensation. Accordingly, injunctive relief is appropriate even under the higher standard for mandatory injunctions.

1.   <u>Likelihood of Success on the Merits</u>

This first factor "is the most important" under *Winter*, and "is especially important when a

---

[4] "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal citations omitted). In other words, a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). A mandatory injunction, on the other hand, "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting *Meghrig v. KFC W., Inc*., 516 U.S. 479, 484 (1996)). Although subject to a higher standard, a mandatory injunction is permissible when "extreme or very serious damage will result" that is "not capable of compensation in damages," and the merits of the case are not "doubtful." *Id*. (internal citations and quotation marks omitted).

plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023). When an immigrant is placed into parole status after having been detained, a protected liberty interest may arise. *Young v. Harper*, 520 U.S. 143, 147-149 (1997)[5]. The Due Process Clause may protect this liberty interest even where a statute allows the immigrant's arrest and detention and does not provide for procedural protections. *Id.* (Due Process requires pre-deprivation hearing before revocation of preparole); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).

*Morrissey* observed that parole allows the parolee to enjoy the same activities as those who have not been arrested and held in custody including, living at home, having a job, and "be[ing] with family and friends and to form the other enduring attachments of normal life." *Morrissey*, 408 U.S. at 482. "Though the [government] properly subjects [the parolee] to many restrictions not applicable to other citizens," such as monitoring and seeking authorization to work and travel, "his condition is very different from that of confinement in a prison." *Id.* "The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id.* The revocation of parole undoubtedly "inflicts a grievous loss on the parolee." *Id.* (quotations omitted). Therefore, a parolee possesses a protected liberty interest in his "continued liberty." *Id.* at 481–84.

In *Pinchi*, the Court held similarly:

> . . . even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody. See *Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

*Pinchi*, 2025 WL 2084921, at *3.

---

[5] In *J.G.G.*, the Supreme Court re-affirmed that aliens are entitled to due process of law in deportation proceedings and must be given notice and an opportunity to be heard commensurate with the nature of the case. *Trump v. J. G. G.*, 145 S. Ct. 1003, 1006 (2025).

During her nearly three years on parole, Ms. Maklad established a stable home with her husband, with whom she has lived throughout her parole. (Doc. 2-2 at 2) The marital bond is such that despite that the trip takes ten hours, Ms. Maklad's husband visits every Saturday. *Id*. During her parole, Ms. Maklad got a job in a restaurant, where she has worked since she was granted the right to work. *Id*. She has also attended college classes. *Id*. All of this demonstrates that parole has allowed her to be with her family and contribute to her community albeit under the terms of her parole. The government does not argue that Ms. Maklad has not gained a protected liberty interest, and the Court finds that she has.

The court must evaluate the three-part test set forth in *Mathews v. Eldridge,* 424 U.S. 319, 334-335 (1976), to determine whether the procedures allowed for the revocation of parole are sufficient to protect the liberty interest at issue. *Pinchi* at *3. In *Mathews*, the Court determined,

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Ms. Maklad has a substantial private interest in being out of custody, which would allow her to live at home, work, attend her college classes, obtain necessary medical care, and continue to provide for and commune with, her family. There is also a risk of erroneous deprivation that the additional procedural safeguard of a pre-detention hearing would help protect against. Notably, already, her I-589 petition has been summarily dismissed, and it appears that if she is not released, she will not receive the consideration of her derivative asylum claims. As other courts have done, the Court concludes that the government's interest in detaining Ms. Maklad or re-detaining her without a hearing is slight. There is no dispute she has abided by all conditions of her parole and, works, goes to college and has medical needs and has no criminal record anywhere in the world. And, the government concedes that has been no change in Ms. Maklad's circumstances that would warrant a finding that she is either a flight risk or a danger to the community. Finally, ICE has determined that Ms. Maklad has demonstrated a credible fear of

persecution or torture if she is returned to Syria. Thus, the Court concludes that she has demonstrated a likelihood of success on the merits.

### 2. Irreparable Harm

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 247, 272 (1976)). Moreover, "[t]he Ninth Circuit has recognized 'irreparable harms imposed on anyone subject to immigration detention' including 'the economic burdens imposed on detainees and their families as a result of detention.'" *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017)); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970 (9th Cir. 2011) [the inability to pursue a petition for review may constitute irreparable harm].

The evidence demonstrates that Ms. Maklad is suffering significant physical and emotional distress from her custodial status. Though important, the greater concern is that it deprives her of the opportunity to pursue her I-589 petition. Though her I-589 petition has been pending for nearly a year, ICE summarily dismissed it within a couple of weeks after her detention *because* she was detained. This circular reasoning suggested that ICE would not permit her, given her detained status, to pursue her claims under the Convention Against Torture and will likely result in her deportation without consideration of her asylum that derives from her husband's grant of asylum. On the other hand, now that ICE has determined that she has a credible fear of return to Syria, she will likely be required to submit a new I-589 petition to allow her § 240 action to proceed. In any event, this evidence demonstrates that she is suffering and will continue to suffer irreparable harm if the preliminary injunction is not granted.

### 3. Balance of the Harms/Public Interest

Because the interest of the government is the interest of the public, the final two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court agrees with the analysis of *Pinchi,* and finds it correctly addresses the situation here:

> "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up) (quoting *Ortiz Vargas*, 2020 WL 5074312, at *4, and then quoting *Hernandez*, 872 F.3d at 996); see also *Preminger v. Principi*, 422 F.3d 815, 826

(9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). Without the requested injunctive relief, Petitioner-Plaintiff faces the danger of significant health consequences and deprivation of her liberty. Yet the comparative harm potentially imposed on Respondents-Defendants is minimal—a mere short delay in detaining Petitioner-Plaintiff, should the government ultimately show that detention is intended and warranted. Moreover, a party "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).

This Court therefore joins a series of other district courts that have recently granted temporary restraining orders barring the government from detaining noncitizens who have been on longstanding release in their immigration proceedings, without first holding a pre-deprivation hearing before a neutral decisionmaker. *See, e.g., Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Garcia v. Bondi*, No. 25-cv-05070, 2025 WL 1676855, at *3 (N.D. Cal. June 14, 2025). Although Petitioner filed her motion shortly after being detained, rather than immediately beforehand, the same reasoning applies to her situation. Her liberty interest is equally serious, the risk of erroneous deprivation is likewise high, and the government's interest in continuing to detain her without the required hearing is low. *See Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. Mar. 3, 2025) (granting a TRO as to an individual who had been detained over a month earlier).

*Pinchi*, at *3. In addition, as noted, should a bond hearing now occur, the government has admits it has no evidence that there is a risk that Ms. Maklad will flee or that she poses a danger to the community. For these reasons and those set forth in *Pinchi*, the Court concludes that the balance of the equities and public interest weigh in favor of Ms. Maklad.

    4.    <u>Bond</u>

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The court has "discretion as to the amount of security required, if any," and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation modified). Because "the [Government] cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753 F.2d at 727, the Court finds that no security is required here.

**CONCLUSION AND ORDER**

For the foregoing reasons, the Court **ORDERS:**

1. Petitioner's Motion for Temporary Restraining Order (Doc. 2) is converted to a Motion for Preliminary Injunction, and it is **GRANTED**.

2. Ms. Maklad **SHALL** be released immediately from Respondents' custody.

3. Respondents are **PERMANENTLY ENJOINED AND RESTRAINED** from re-arresting or re-detaining Ms. Maklad absent compliance with constitutional protections, which include at a minimum, pre-deprivation notice—describing the change of circumstances necessitating her arrest—and detention, and a timely bond hearing. At any such hearing, the Government **SHALL** bear the burden of establishing, by clear and convincing evidence, that Ms. Maklad poses a danger to the community or a risk of flight, and Ms. Maklad **SHALL** be allowed to have her counsel present.

IT IS SO ORDERED.

Dated:   **August 8, 2025**                                   _Jennifer L. Thurston_
                                                              UNITED STATES DISTRICT JUDGE